UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BIG FISH ENTERTAINMENT LLC,                                :

                           Plaintiff,                :    21 Civ. _21-275_____

                                        :      ECF Case

             -against-                            :

                                        :    **COMPLAINT**

WILLIAMSON COUNTY SHERIFF'S OFFICE,      :    TRIAL BY JURY DEMANDED
AUSTIN POLICE DEPARTMENT,
LIEUTENANT JAMES DAVID (in his individual   :
capacity), and DOES 1 through 10, inclusive,        :

                     Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff Big Fish Entertainment LLC ("Big Fish" or "Plaintiff") by and through their attorneys Davis Wright Tremaine LLP and Sumpter & González, L.L.P., for their Complaint, hereby allege against Defendants Williamson County Sheriff's Office ("WCSO"), Austin Police Department ("APD"), Lieutenant James David ("Lt. David") and Does 1 through 10 (collectively, "Defendants") as follows:

<u>PRELIMINARY STATEMENT</u>

       1.    A vibrant and free press is essential to a healthy democracy.  Indeed, the press plays a vital role in informing the citizenry about public affairs and the actions of government at all levels.  As such, the founders saw fit to enshrine the freedom of the press in the First Amendment to the U.S. Constitution.

       2.    Recognizing that the autonomy of the press would be jeopardized if authorities could freely seize, subpoena, or otherwise compel access to the sources and unpublished newsgathering materials of journalists and others engaged in disseminating information to the public, states around the country have enacted "Shield Laws" that require law enforcement and

1

other litigants seeking access to such materials to satisfy a heavy burden.  *See*, *e.g.*, Tex. Crim. Proc. Art. 38.11; N.Y. Civil Rights Law § 79-h.  As courts have ruled, compelled disclosure of nonconfidential newsgathering is inimical to a free and democratic society.  *See Holmes v. Winter*, 22 N.Y.3d 300, 308-309 (2013).

3.      Consistent with this policy in favor of protecting the press from unreasonable intrusion into their protected work product, Congress passed the Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa *et seq.* (the "PPA"), which prohibits government officials from searching and seizing work product materials" from a "person reasonably believed to have a purpose to disseminate to the public a . . . broadcast, or other similar form of public communication . . . ." 42 U.S.C. §§ 2000aa(a).  In essence, the PPA creates a "subpoena-first rule," requiring the government to justify its need for unpublished newsgathering materials by overcoming the heavy burden imposed by state Shield Laws before haphazardly searching or seizing such materials from journalists and others engaged in newsgathering in the field.

4.      *Live PD*, a real-life documentary television series produced by Big Fish Entertainment LLC ("Big Fish") and distributed by A&E, followed the activities of multiple law enforcement agencies as their officers patrolled communities within their jurisdictions, responded to calls for service, investigated criminal activity, and interacted with the public.  Its production crews embedded with law enforcement agencies around the country and engaged in critical newsgathering that provided the public with an unvarnished, inside look at real-life policing in America.  *Live PD*, like newspapers, magazines, broadcast news, documentaries, and other vehicles for dissemination of information to the public, enjoys the full protection of state Shield Laws, the PPA, and protections of the U.S. Constitution for speech and the press.  The fact that *Live PD* and similar programming may earn a profit "does not prevent them from being

a form of expression whose liberty is safeguarded by the First Amendment." *Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). Indeed, courts have determined that *Live PD* production crews are fully protected journalists under New York and related Shield Laws, protection that covers their unpublished video reporting for *Live PD*.

5.      In the early morning hours of March 28, 2019, a *Live PD* production crew covering the Williamson County Sheriff's Office was riding along with two WCSO deputies and recording video footage of the deputies as they policed their communities. As part of their newsgathering, the production crew video recorded the chase, arrest, and tragic passing of Javier Ambler while he was in the custody of the WCSO and the APD.

6.      When it became apparent that Mr. Ambler was non-responsive, the production crew stopped filming. Thereafter, WCSO and APD established a crime scene and asked the production crew to stand behind the police tape.

7.      On information and belief, WCSO and APD then took the extraordinary step of jointly seizing the production crew's cameras and footage of the incident that the crew had left in WCSO squad cars. WCSO did not have a warrant, a subpoena, or even probable cause to believe that any of the *Live PD* crew had committed or was committing a criminal offense. They simply acted under color of state law without any consideration for federal law or the rights of the Plaintiff.

8.      For the next hour or more, WCSO and APD prevented the production crew from recovering their cameras and footage from the WCSO squad cars because they considered the *Live PD* unpublished newsgathering materials to be evidence secured in the police custody. Specifically, WCSO Lt. David and others prevented the production crew from recovering their cameras and footage from the WCSO squad cars.

3

9.      Eventually, upon prodding from the *Live PD* crew members on the ground, law enforcement permitted the crew members under the police tape to retrieve whatever belongings and equipment they had left in the WCSO squad cars (including their video footage of the events) and the crew then left the scene.

10.     The next morning, pursuant to Big Fish's standard practice, the footage was sent to Big Fish's New York headquarters, where all editorial decisions (including what footage to include in each *Live PD* episode) are made.  After a review of the March 28, 2019 footage, the editorial decision was made to not include the footage in any episode of *Live PD*.  The footage has never aired.

11.     Big Fish anticipated that Williamson County and/or Travis County promptly would serve a valid subpoena or obtain a court order to obtain a copy of the footage and Big Fish stood ready to respond.  Big Fish has fully cooperated with timely and formal requests from law enforcement in the past, including by turning over footage in response to both valid subpoenas and court orders.  In particular, on two other occasions when its film crews captured someone's death, authorities issued subpoenas within days and Big Fish ultimately turned over its footage to aid any investigation.

12.     Yet, in the weeks and months that followed Mr. Ambler's death, both Williamson County and Travis County did not serve a valid subpoena to Big Fish and did not obtain any court order.  It was only a year later on the heels of public outcry surrounding recent deaths of Black Americans at the hands of the police, and after doing almost nothing for the intervening year, that Texas authorities in the summer of 2020 began to earnestly investigate the circumstances surrounding Mr. Ambler's death.

13.     Big Fish brings this action to redress the patently illegal and unconstitutional seizure of its footage at the scene of Mr. Ambler's tragic death.  Even a brief taking of First Amendment rights is unconstitutional and a clear violation of the Privacy Protection Act, 42 U.S.C. § 2000aa(a) (the "PPA").  The PPA prohibits government officials from searching and seizing "work product materials" from a "person reasonably believed to have a purpose to disseminate to the public a . . . broadcast, or other similar form of public communication . . . ." *Id*.  While the brief but wrongful taking of its cameras and footage by WCSO and APD caused Big Fish actual damage and clearly violated the law, that is not the only damage Big Fish has suffered as a result of WCSO and APD's erroneous view that they controlled and had immediate rightful access to Big Fish's footage.  WCSO and APD's taking on March 28, 2019 was only the beginning of the harm Big Fish suffered.  The illegal seizure of its footage was premised on the false foundation that WCSO somehow owned or controlled Big Fish's footage, and a year later this same false narrative was used to fuel a public campaign that vilified Big Fish and caused it untold economic damage and reputational harm.

14.     In an effort to excuse their inexcusable delay in taking any real action to investigate or prosecute the events surrounding Mr. Ambler's death, Williamson County and Travis County publicly sought to blame Big Fish as "stonewalling" the investigation or somehow "tampering" with the evidence.  Williamson County falsely claimed that it controlled and should have had regular access to Big Fish's unaired footage, including the footage surrounding Mr. Ambler's death.  In fact, these contentions are verifiably and knowingly false.  In the year that followed Mr. Ambler's death, both Williamson County and Travis County failed to obtain and serve on Big Fish a valid subpoena seeking its footage.  Nor did they obtain any court order directing Big Fish to retain or turn over its footage.  This inaction lingered despite being on

actual or constructive notice that Big Fish's agreement with Williamson County expressly provided that Big Fish was the "sole and exclusive owner" of its footage and required that all unaired or raw footage "shall be destroyed by [Big Fish] no later than thirty (30) days after the Raw Footage is captured, except to the extent [Big Fish] is required to retain the Raw Footage pursuant to a valid court order or other state or federal laws."

15.     Even more telling, Travis County never needed Big Fish's footage to investigate and take any appropriate action arising out of Mr. Ambler's death because the footage was entirely duplicative of evidence already in its possession.  Even assuming the authorities had promptly taken legal action to obtain the footage (which they did not) or that they could overcome Shield Law privileges protecting such newsgathering materials, Big Fish's footage would still have been unnecessary to complete a full and thorough investigation.

16.     The incident involving Mr. Ambler was recorded by both dash cam footage and APD body cam footage (some of which has already been released publicly), and at least four APD officers – in addition to the three arresting officers – were on the scene and witnessed the events firsthand.  In short, law enforcement is already in possession of evidence that completely and comprehensively documents Mr. Ambler's death.  Since ample alternative sources of video evidence and eyewitness testimony exist, even if the footage still existed or authorities had obtained a court order to require the production of the footage in a timely manner when it did exist, law enforcement would not be entitled to obtain the footage under the New York and Texas State Shield Laws.  Put simply, Big Fish's unpublished newsgathering materials are not critical or necessary for any prosecution of the officers and the information documented in the footage not only is available from multiple alternative sources, but those alternative sources are already in law enforcement's possession.

17.     Likewise, through its statements and actions, WCSO – along with Williamson County District Attorney, Sean Dick – set in place a *de facto* custom, policy, and practice of seizing and retaining cameras, footage, and newsgathering equipment from journalists based on speculation that the journalists may have captured relevant footage, instead of going through the proper procedure of issuing valid subpoenas for the footage, as the PPA, First Amendment and Fourth Amendment, and Fourteenth Amendments require.  Upon information and belief, the Austin Police Department in concert with the Travis County District Attorney's Office adopted the same *de facto* custom, policy, and practice.  Here, the seizure and retention of Plaintiff's cameras, footage, and equipment was done pursuant to both defendants' illegal and constitutionally invalid policies.

18.     There is no justification for the authorities' violation of the PPA and the constitutional rights of Big Fish and those of its journalists.  No law enforcement authority ever suggested to the *Live PD* production crew that they had footage of a criminal act.  Nor did Williamson County or Travis County officers even ask to interview the *Live PD* production crew on the scene or in the months that followed.  Indeed, no substantive effort to investigate Mr. Ambler's death was undertaken until the public demanded some action, over a year after his death occurred.  Williamson County and Travis County's response was to deflect blame for their own inexcusable inaction by falsely claiming their efforts were impeded by Big Fish.  This action seeks to redress the very real damage they caused.

## THE PARTIES

### A.     Plaintiff

19.     Plaintiff Big Fish is a content production company, organized under the laws of New York, with its principal place of business at 5 Times Square, 9th Floor, New York, NY 10036.  Big Fish has produced cable programming and digital content for top television networks

including Discovery, VH1, A&E, TLC, MTV, WE, E!, National Geographic, Oxygen, Planet

Green, Travel Channel, Spike, Smithsonian Network, and G4. Big Fish has produced hundreds

of hours of award-winning and top-rated programming in the documentary, lifestyle, unscripted,

and reality documentary spaces, including several programs that feature the monitoring and

documenting of law enforcement and emergency response activities in real time. Big Fish

produced the real-life documentary series, *Live PD*, which was distributed by A&E until June

2020, as well as programs including *Live Rescue*, *Animal ER Live*, *Live PD Presents Women on

Patrol*, and *Sturgis Cops*.

**B.     Defendants**

20.     Defendant WCSO is a governmental agency of the County of Williamson County,

Texas, with its headquarters at 508 S. Rock St., Georgetown, TX 78626.

21.     Defendant APD is a governmental entity of the City of Austin, Texas, with its

headquarters at 715 E. Eighth St., Austin, TX 78701.

22.     Defendant Lt. David is a ranking deputy employed by the Defendant WCSO. Lt.

David's actions as alleged in this Complaint were taken under color of the laws of the State of

Texas. He is sued in his individual capacity.

23.     Defendants Does 1-5, who are sued under fictitious names, are duly licensed

police officers and employees of the Defendant WCSO who also may be responsible for the

unlawful activities complained of herein. Once Plaintiff ascertains their identities, Plaintiff will

seek leave of the Court to amend the Complaint to include Defendants Doe 1 through Doe 5 as

named defendants.

24.     Defendants Does 6-10, who are sued under fictitious names, are duly licensed

police officers and employees of the Defendant APD who also may be responsible for the

unlawful activities complained of herein. Once Plaintiff ascertains their identities, Plaintiff will

seek leave of the Court to amend the Complaint to include Defendants Doe 6 through Doe 10 as named defendants.

## JURISDICTION AND VENUE

25.     This action is brought pursuant to 42 U.S.C. § 2000aa-6, 42 U.S.C. § 1983, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

26.     This Court has personal jurisdiction over each of the Defendants because, upon information and belief, each Defendant is domiciled in the State of Texas.

27.     Venue is proper in this District under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.**     ***Live PD* and the WCSO Production Crew**

28.     *Live PD* is a documentary series that followed the activities of multiple law enforcement agencies as their officers patrolled communities within their jurisdictions, responded to calls for service, investigated criminal activity, and interacted with the public.  All *Live PD* production crews reported to and were supervised by Big Fish executives headquartered in New York.  On some nights, the footage from the production crews was live-streamed to New York, while on other nights, the crews would record events and the footage was sent to New York the next day for editorial evaluation.  All editing and production related work was done in New York, and all editorial decisions including what footage to include in each episode were made in New York.  *Live PD* aired on A&E from New York.

29.     The *Live PD* production crew assigned to the WCSO consisted of Colin Mika and Jeff Moriarty (both Producers / Camera Operators), as well as Kate Mika (Supervisory Producer) and Ruby Garson Tarzian (Associate Producer).  The production crew with WCSO, like all *Live PD* crews, operated independently in that they determined what to document and how to

interview participants.  At the same time, all law enforcement actions were undertaken

independently without input or any oversight by the *Live PD* crews.  Further, as a matter of

professional protocol, and a matter of Big Fish policy, production crew members did not assist

the police in any way, and did not ask that the police assist them in any way.  At the same time,

WCSO played no role and did not interfere with how Big Fish filmed events.

30.     Both Messrs. Mika and Moriarty generally used two cameras on a given night:  a

handheld camera and a GoPro mounted to the windshield of the police car that captures images

outside the front of the car in a manner and from an angle nearly identical to the police dash cam.

The handheld cameras used standard SD cards to record footage whereas the GoPros used

microSD cards.

**B.     The Ambler Incident**

31.     On the evening of March 28, 2019, Mr. Mika was riding along with WCSO

Deputy James Johnson, while Ms. Tarzian and Mr. Moriarty were riding with WCSO Deputy

Zachary Camden.  As the pursuit of Mr. Ambler began near the end of Deputy Johnson's shift

that night, Mr. Mika's GoPro stopped recording shortly into the chase because the microSD card

in the camera had reached capacity.  Because the chase was ongoing, Mr. Mika was unable to

replace the microSD case in the GoPro.  Likewise, though Mr. Moriarty's GoPro recorded

footage during the chase, Deputy Camden's car was not in range of Mr. Ambler's vehicle, so no

footage was captured of Mr. Ambler until he was stopped.

32.     When Mr. Ambler's car became disabled, Mr. Mika followed Deputy Johnson out

of the squad car and began recording on his handheld camera.  Deputy Camden arrived on the

scene moments after Deputy Johnson and parked his car some distance from Mr. Ambler.  Mr.

Moriarty exited the vehicle and began recording with his handheld camera, while Ms. Tarzian

remained in the backseat of the squad car.  APD Officer Michael Nissen also captured the

incident on his body camera.  Officer Nissen assisted the WCSO officers in making the arrest.

Shortly thereafter, several APD officers arrived on the scene to also witness the incident.

Messrs. Mika and Moriarty video recorded the encounter with Mr. Ambler from a safe distance

and stopped recording when it appeared Mr. Ambler could not be resuscitated.

33.     The *Live PD* footage was duplicative of footage captured by the APD body

cam(s) and the dash cam footage captured by the WCSO.  Indeed, the APD body cam footage is

publicly available, and the dash cam footage has been described in meticulous detail in a publicly

available April 12, 2019 report prepared by Sergeant David (T.A.) Lowthorp of the Williamson

County Sheriff's Office, Office of Professional Standards.[1]

34.     After Mr. Ambler died, law enforcement officials from both departments, WCSO

and APD, began a co-investigation and jointly secured the area where Mr. Ambler's vehicle was

located.  As the two departments began their investigation, expecting then that he would leave

the scene with Deputy Camden, Mr. Moriarty placed his camera with his other video equipment

in Deputy Camden's vehicle and stood with Ms. Tarzian and Mr. Mika behind the police tape.

Ms. Tarzian also left her belongings in Deputy Camden's vehicle.  Mr. Mika kept his handheld

camera with him the entire time but left his GoPro and other equipment in Deputy Johnson's car.

35.     At that point, upon information and belief, WCSO and APD took it upon

themselves to seize the production crew's cameras, footage, and equipment sitting in the WCSO

patrol cars.  Upon information and belief, Lt. David and others actively prevented the production

crew from recovering their cameras and footage from the WCSO squad cars.

---

[1] Scribd, "Attorney General Open Records Request," (uploaded June 8, 2021),
https://www.scribd.com/document/464848801/Attorney-General-Open-Records-Request#fullscreen&from_embed
(last accessed Mar. 25, 2021).

36.     The production crew was not under suspicion of committing any crime, much less of committing any purported criminal offense recorded in the footage.  Nor was there reason to believe that the immediate seizure of the Big Fish cameras, footage, and equipment was necessary to prevent the death of, or serious bodily injury to, a human being.

37.     As these events unfolded, Ms. Tarzian telephoned Ms. Mika to ask her to pick up the production crew because the WCSO deputies could not drive the crew back to Williamson County.  When Ms. Mika arrived at the scene, she spoke with authorities, and sought permission for the production crew to retrieve their belongings from the patrol cars, including the seized cameras, footage, and equipment.  Eventually, the production crew was permitted belatedly to retrieve their cameras, footage, and other equipment from the patrol cars.  Messrs. Mika and Moriarty were escorted by an officer under the police tape to get their possessions from the cars, and another officer retrieved Ms. Tarzian's possessions for her.  Ms. Mika then drove the production crew back to their hotel.

**C.     The *Live PD* Footage**

38.     The next morning, Ms. Mika sent the footage that Messrs. Mika and Moriarty recorded to Big Fish's New York offices via Federal Express so it could be reviewed editorially to determine whether any of the footage would be used in a *Live PD* episode.  None of the members of the *Live PD* production crew know what happened to the footage after it was sent to New York.  The production crew was back in Williamson County producing *Live PD* the next day.

39.     *Live PD* editors determined that they would not use any of the footage surrounding the Ambler incident in part because the footage included the death of an individual.  Determining whether to air footage that included the death of an individual was an editorial decision made on a case-by-case basis.

40.     As a matter of practice and policy, *Live PD* routinely recycled unaired footage unless a valid subpoena or other written demand for the footage had been received.  They do so for several reasons, including to avoid becoming an arm of litigants or law enforcement who may want to use *Live PD* footage to litigate or prosecute claims.  Further, *Live PD* and its related shows capture hundreds of hours of footage a week and it is impossible as a practical matter to retain such unaired footage.

41.     *Live PD*'s practices were documented in the contract between Williamson County and Big Fish in place at the time of Mr. Ambler's death.  The contract expressly required *Live PD* producers to destroy any unaired video footage after 30 days, unless a court order required such footage to be retained.  Williamson County and Travis County were aware, or should have been aware, of the terms of the publicly available contract between Williamson County and Big Fish.

42.     The 30-day destruction policy was added to the Williamson County contract at the behest of the Williamson County Commissioners.  At a January 8, 2018 Williamson County Commissioner's Court meeting,[2] County Attorney Nassour made clear that he personally insisted on adding a 90-day destruction policy to the contract (the parties eventually agreed on a 30-day destruction policy).  Further, both Nassour and the elected County Attorney Dee Hobbs explained that all footage belongs to *Live PD*, is not subject to Williamson County control, and does not trigger the provisions of the Michael Morton Act, which requires prosecutors to turn over evidence to a criminal defendant in the course of a prosecution, regardless of its materiality to guilt or punishment.  In support of the destruction policy expressly provided for in the contract, the elected County Attorney and the elected Williamson County Judge expressed

---

[2] https://williamsoncountytx.new.swagit.com/videos/01092018-1758#0?fp=swagit (last accessed Mar. 25, 2021).

concerns about unaired footage being sold to a third party and edited to portray Williamson County in an unfair light.

43.     Big Fish has over a decade of experience producing television programs that feature the monitoring and documenting of law enforcement and emergency response activities in real time.  During that period, Big Fish has received numerous subpoenas for its footage and has a documented history of responsibly addressing and responding to such subpoenas.  On the few occasions when *Live PD* crews captured the death of a suspect or officer in the line of duty, Big Fish has promptly (often within a day or so) received a subpoena seeking the relevant footage.  On these occasions, Big Fish has fully cooperated with such law enforcement subpoenas and has turned such footage over to law enforcement in appropriate instances.

44.     Upon information and belief, Big Fish's retention and recycling practices are consistent with the way that other newsgathering entities address unpublished newsgathering materials.  As a matter of standard practice, news organizations independently determine what, if anything, they will air or report concerning newsworthy events, like arrests and crime scenes. Similarly, as a matter of standard practice, news organizations develop internal policies and/or practices concerning the retention of unpublished newsgathering materials. There is no obligation in the law that a news organization must retain unpublished newsgathering materials absent a court order or subpoena demanding such retention.

45.     In the days and weeks following Mr. Ambler's death, Big Fish stood ready to respond promptly and address any valid subpoena or court order issued seeking the footage obtained on March 28, 2019.  However, no subpoena was served in the 30-day period following Mr. Ambler's death.

**D.     More Than A Year Later, Following Public Outcry, Texas Law Enforcement Begins Investigation into Mr. Ambler's Death**

46.     Law enforcement officials failed to investigate the circumstances of Mr. Ambler's death in a timely manner.  Not until more than a year after Mr. Ambler's death, and only on the heels of public outcry surrounding recent deaths of Black Americans at the hands of the police, did law enforcement officials begin to seriously investigate the events that took place on the evening of March 28, 2019.

47.     Following the death of George Floyd in May 2020, Margaret Moore, the Travis County District Attorney, and Shawn Dick, the Williamson County District Attorney, announced that their offices were undertaking a "joint investigation into the death of Javier Ambler."[3]  The joint announcement provided that APD would be "taking the lead in the officers' use of force investigation, while the Williamson County D.A.'s Office will take the lead in the investigation involving possible tampering with evidence by personnel from Williamson County Agencies who have had contact or communications with the television show, *Live PD*."

48.     As law enforcement officials began to take belated steps to initiate an investigation, District Attorney Moore made comments to the press suggesting that Big Fish and *Live PD* were in some way responsible for the delay in investigating Mr. Ambler's death.  For example, in an interview on June 8, 2020, District Attorney Moore stated that the "key factor in the delay" of investigating Mr. Ambler's death was "the lack of cooperation by the Williamson County Sheriff's Office and *Live PD*" because both of those entities are "the holders of critical information to a complete investigation."[4]

---

[3] Matthew Quick, "Travis and Williamson County DAs announce joint investigation into Javier Ambler case," Fox 7 Austin (June 19, 2020), https://www.fox7austin.com/news/travis-and-williamson-county-das-announce-joint-investigation-into-javier-ambler-case (last accessed Mar. 25, 2021).

[4] YouTube, "Travis County DA says WCSO, Live PD 'stonewalled' in-custody death investigation," KXAN (June 8, 2020), https://www.youtube.com/watch?v=aty17yk12WI (last accessed Mar. 25, 2021).

49.     Likewise, in a June 9, 2020 article in the Austin American-Statesman, unnamed investigators from the Travis County District Attorney's Office told the reporter that both "[Williamson County Sheriff] Chody and 'Live PD' producers have repeatedly stonewalled their efforts to obtain evidence or interviews with the officers involved."[5]

50.     However, subsequent statements attributed to District Attorney Moore's office correctly omitted *Live PD* and Big Fish from any talk of "stonewalling," including a June 9, 2020 Tweet from District Attorney Moore and a follow-up story written by the same Austin American-Statesman reporter similarly citing to unidentified "investigators."[6]

51.     These statements by Travis County officials alleging stonewalling were false, and were made to smear Big Fish when facts show that Big Fish waited in anticipation of a valid subpoena or court order to provide the footage and did nothing to stonewall the investigation. Indeed, the rhetorical transformation from the Travis County District Attorney's Office – removing its false contention that Big Fish had "stonewalled" the investigation – is a tacit admission that there is and was no evidence or basis to suggest that *Live PD* or Big Fish played any role in the delayed investigation into Mr. Ambler's death.  The real problem was that prosecutors and the police in both Travis and Williamson Counties were disinterested in investigating Mr. Ambler's death and only saw fit to take action over a year later, after public

---

[5] Tony Plohetski, "Texas police chase ends in death as 'Live PD' cameras roll. 'I can't breathe,' the man cries," Austin American-Statesman (June 9, 2020), https://www.statesman.com/zz/news/20200609/texas-police-chase-ends-in-death-as-live-pd-cameras-roll-i-cant-breathe-man-cries?rssfeed=true (last accessed Mar. 25, 2021).
[6] *See*, *e.g.*, Margaret Moore, @ElectMargaret, Twitter (June 9, 2020, 2:30PM), https://web.archive.org/web/20200608224526/https://twitter.com/ElectMargaret/status/1270106058116169744 (last accessed Mar. 25, 2021) ("Over the last year, the District Attorney's Office has been fighting with Williamson County Sheriff's Office to have Live PD video footage related to Javier Ambler's death released. . . . For the last year, *Wilco has stonewalled our investigation*." (emphasis added); Tony Plohetski, "Grand jury weighs evidence in 'Live PD' Javier Ambler video destruction," Austin American-Statesman (Sept. 11, 2020), https://www.statesman.com/story/news/crime/2020/09/11/grand-jury-weighs-evidence-in-lsquolive-pdrsquo-javier-ambler-video-destruction/42563011/ (last accessed Mar. 22, 2021) (referring to unnamed investigators from the Travis County and Williamson County District Attorney's Offices who told the reporter that only "*Chody* stonewalled them") (emphasis added).

reaction to George Floyd's death made their inaction no longer politically tenable.[7] The Travis County District Attorney's Office's statements about Big Fish attempted to deflect blame for its own earlier failure to investigate and impanel a grand jury.

52.     Similarly, District Attorney Dick told the Austin American-Statesman in a March 12, 2021 article that "attempts to get video from 'Live PD' through subpoenas had previously proven unfruitful."[8] In fact, Dick's office *never* served a subpoena on Big Fish for any of its footage and most specifically the Ambler footage.

53.     Confirming the practice and policy in place, Dick also told Chody, according to the same Statesman article, that his deputies should seize Big Fish's footage rather than going through the proper procedure of subpoenaing the footage because the latter was simply too time-consuming and expensive.

54.     Likewise, emails between Dick and Chody reveal that Dick had pressed Chody on multiple occasions to identify the *Live PD* crewmembers who witnessed and recorded video of any felony incident, in order "[t]o assist in procuring the raw footage of the felony arrest."[9] Dick then explained the failure to obtain footage directly from *Live PD* – which the access agreement between Big Fish and Williamson County expressly prohibits – "makes prosecution of these felonies immensely more difficult."

55.     The PPA prohibits government officials from searching and seizing "work product materials" from a "person reasonably believed to have a purpose to disseminate to the

---

[7] *See* Jason Hanna, "3 recordings. 3 cries of 'I can't breathe.' 3 black men dead after interactions with police," CNN (June 10, 2020), https://www.cnn.com/2020/06/10/us/cant-breathe-deaths-javier-ambler-george-floyd-manuel-ellis/index.html (last accessed Mar. 22, 2021) ("*Days after Floyd's death*, [Mr. Ambler] began to capture national headlines, though [he] died months before.") (emphasis added).
[8] Tony Plohetski, "Emails spotlight 'Live PD' fight; Williamson County's top law officials argued over evidence," Austin American-Statesman (Mar. 14, 2021), https://www.statesman.com/story/news/2021/03/12/live-pd-police-footage-williamson-county-robert-chody-da-shawn-dick-emails/6935685002/.
[9] https://www.scribd.com/document/498479029/2019-Williamson-County-emails#from_embed, at 44-45

public a . . . broadcast, or other similar form of public communication . . . ."  42 U.S.C. §

2000aa(a).  The PPA broadly applies to editorial "work product" – at issue in this case – and also

to any other "documentary materials."  42 U.S.C. §§ 2000aa(a)-(b).  The law, which applies to

state and local officials in addition to federal officials, creates a "subpoena-first rule" that

protects journalists and others responsible for disseminating information to the public from

searches and seizures of their work product or documentary materials, unless the officials have a

reasonable belief that one of the PPA's exceptions apply.

56.    Indeed, on information and belief, Defendants were informed that it was improper

to seize Big Fish's cameras and any footage they contained, and after a delay expressly permitted

the *Live PD* production crew to enter the vehicles to retrieve their newsgathering materials.

After removing the false specter of the footage being in the "lawful custody" of authorities, one

is simply left with journalists lawfully videotaping newsworthy events and the loss or destruction

of their unpublished materials that were not subject to any formal process (which law

enforcement declined to timely pursue).  The seizure of these materials constitutes a flagrant

violation of the PPA.

57.    The narrow exceptions to the PPA do not apply in this case.  No exigent

circumstances existed in which immediate seizure of the footage was necessary to protect

someone's physical safety.  42 U.S.C. § 2000aa(a)(2).  Nor was there any probable cause to

believe that any of the *Live PD* production crew "ha[d] committed or [wa]s committing the

criminal offense to which the materials relate."  42 U.S.C. 2000aa(a)(1).  Neither WCSO nor

APD arrested the *Live PD* crew, and there is certainly no reason to believe that any of them had

committed a criminal offense that evening; indeed, the same *Live PD* crew was invited back to

continue filming WCSO's activities the following day.

58.     Likewise, even assuming the "other documents" provision of the PPA applied rather than the "work product materials" provision – which it does not – there is no reasonable reason to believe that Big Fish would have destroyed the footage before law enforcement officials could formally request that Big Fish provide the footage.  Indeed, Big Fish has fully cooperated (including by turning over footage) in similar situations.

59.     In addition to the PPA, the seizure of the *Live PD* cameras, footage and equipment, and the initial refusal to return the materials seized, also violated Big Fish's and the *Live PD* production crew's First, Fourth, and Fourteenth Amendment rights.  The access agreement between Big Fish and Williamson County expressly provided that Big Fish was the "sole and exclusive owner" of its footage.  In practice, however, Williamson County afforded no respect to this provision.  Specifically, in concert with District Attorney Dick, WCSO put in place a *de facto* custom, policy, and practice within WCSO of barging ahead with seizing and retaining cameras, footage, and newsgathering equipment from journalists, instead of going through the proper procedure of subpoenaing footage.  In Dick's own words, obtaining the footage through the process provided by law and required by the PPA would make the prosecution of felonies "immensely more difficult."  Likewise, on information and belief, APD in concert with then-Travis County District Attorney Margaret Moore, put in place a similar *de facto* custom, policy, and practice.  Indeed, District Attorney Moore has also publicly expressed frustration that authorities had not been successful in brazenly trying to obtain the footage from Big Fish itself, instead of through the proper method of issuing a valid subpoena for the footage.[10]

---

[10] *See, e.g., supra* note 6, Margaret Moore, @ElectMargaret, Twitter (June 9, 2020, 2:30PM), https://web.archive.org/web/20200608224526/https://twitter.com/ElectMargaret/status/1270106058116169744 (last accessed Mar. 25, 2021) ("Over the last year, the District Attorney's Office has been fighting with Williamson County Sheriff's Office to have Live PD video footage related to Javier Ambler's death released");

60.     These customs, policies, and practices set in motion the unconstitutional and illegal seizure in the early morning hours of March 28, 2019 where, faced with a potentially difficult prosecution arising from Mr. Ambler's death, WCSO deputies and APD officers ignored the PPA, Big Fish's constitutional rights, and the relevant provisions in the access agreement and forged ahead with seizing and retaining Big Fish's cameras, footage, and equipment based on an unwavering desire to obtain potentially relevant information about a felony arrest at any cost.

61.     In the end, WCSO and APD jointly seized unpublished newsgathering materials from journalists because they followed custom, policy and practice of their respective departments.  But that unpublished newsgathering material is privileged by the Shield Law, and the seizure is a clear violation of federal law and the constitutional rights of the Plaintiff.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of the Privacy Protection Act of 1980 (42 U.S.C. §§ 2000aa *et seq.*)**
(ALL DEFENDANTS)

62.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

63.     The seizure of the Plaintiff's cameras, footage, and equipment constituted a search and/or seizure of work product materials owned by Big Fish from Messrs. Mika and Moriarty, who the officers knew had recorded the footage for the purpose of disseminating the footage to the public on the television show *Live PD*, which is distributed on A&E and via the internet to viewers throughout the country.

---

Russell Falcon, "Joint investigation into Javier Ambler's death launched by Travis, Williamson County DAs," KXAN (June 19, 2020), https://www.kxan.com/news/joint-investigation-into-javier-amblers-death-launched-by-travis-and-williamson-county-das/ (last accessed Mar. 25, 2021) ("Moore has previously said that WCSO and 'Live PD' producers have not cooperated with the investigation, saying her office has been 'fighting' for the footage for a year.").

64.     This seizure of the Plaintiff's cameras, footage, and equipment, and the ensuing deprivation for over one hour while the officers retained the property, violated the PPA, 42 U.S.C. § 2000aa *et seq.*

65.     There was no probable cause to believe that Messrs. Mika or Moriarty had committed or was committing the criminal offense recorded in the footage.

66.     There was no reason to believe that the immediate seizure of the Big Fish cameras, footage, and equipment was necessary to prevent the death of, or serious bodily injury to, a human being.

67.     The officers and other members of WCSO and APD who had access to Plaintiff's cameras, footage, and equipment acted with reckless and callous indifference to the Plaintiff's federally protected rights, and lacked any reasonable good faith belief in the lawfulness of their conduct.

68.     By reason of these seizures of their cameras, footage, and equipment, and the events that followed predicated on the same erroneous belief that Defendants were entitled to full access to Plaintiff's unaired footage without pursuing legal process, Plaintiff suffered damages, including:

a)  All the costs of addressing and responding to any investigations and other associated expenses, including attorney fees and costs; and

b)  Damage to its professional reputation.

69.     Defendants are liable under 42 U.S.C. § 2000aa-6 for Plaintiff's damages of not less than $1,000 plus attorneys' fees and costs.

<u>SECOND CAUSE OF ACTION</u>
**Section 1983 Claim for Violation of Plaintiff's First and Fourteenth Amendment Rights**
**(42 U.S.C. § 1983)**
(AGAINST WILLIAMSON COUNTY SHERIFF'S OFFICE and AUSTIN POLICE
DEPARTMENT)

70.     Plaintiff repeats and realleges each and every allegation above as if fully set forth

herein.

71.     Observing and recording police activity in public is fully protected by the free

speech and free press clauses of the First Amendment to the United States Constitution, as applied

to the State of Texas under the Fourteenth Amendment.

72.     By seizing the Plaintiff's cameras, footage, and equipment in response to their

recording police activity in public, Defendants violated Plaintiff's clearly established First

Amendment rights to gather, record, and disseminate news and information about events of public

interest and of related police activity in public places.

73.     The seizure of and failure to immediately return the Plaintiff's cameras, footage,

and equipment violated Plaintiff's clearly established First Amendment rights to gather, record,

and disseminate news and information about events of public interest and of related police activity

in public places.

74.     The seizure of and failure to immediately return the Plaintiff's cameras, footage,

and equipment was done pursuant to WCSO's and APD's de facto customs, policies, and practices

of seizing and retaining cameras, footage, and newsgathering equipment from journalists based on

speculation that the journalists may have captured relevant footage, instead of going through the

proper procedure of subpoenaing the footage. The implementation of these de facto policies

violated Big Fish's First Amendment rights to gather, record, and disseminate news and

information about events of public interest and of related police activity in public places.

75.     Defendants, each of whom were acting under color of state law, violated a clearly established constitutional right of which all WCSO and APD police officers knew, or of which reasonable police officers should have known, rendering them liable to Plaintiff under 42 U.S.C. § 1983.

76.     Defendants acted with reckless and callous indifference to Plaintiff's First Amendment rights.

77.     The denial of constitutional rights is irreparable injury per se, and Plaintiff is entitled to declaratory and injunctive relief.

78.     As a direct and proximate result of all of the violations of the Plaintiff's First Amendment rights, and the events that followed predicated on the same erroneous belief that Defendants were entitled to full access to Plaintiff's unaired footage without pursuing legal process, the Plaintiff suffered damages, including:

    a)  All the costs of addressing and responding to any investigations and other associated expenses, including attorneys' fees and costs; and

    b)  Damage to its professional reputation.

### THIRD CAUSE OF ACTION
**Section 1983 Claim for Violation of Plaintiff's Fourth and Fourteenth Amendment Rights**
**(42 U.S.C. § 1983)**
(AGAINST WILLIAMSON COUNTY SHERIFF'S OFFICE and AUSTIN POLICE DEPARTMENT)

79.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

80.     Under the Fourth Amendment to the United States Constitution, as applied to the State of Texas under the Fourteenth Amendment, Plaintiff has a right to be free from unreasonable searches and seizures.

81.     Defendants, each of whom were acting under color of state law, violated the Plaintiff's clearly established Fourth Amendment rights to be free from unreasonable seizures seizing the Plaintiff's cameras, footage, and equipment without probable cause to believe that Messrs. Mika or Moriarty were engaged in any criminal activity.

82.     Defendants violated the Plaintiff's clearly established Fourth Amendment rights to be free from unreasonable seizures by retaining Plaintiff's cameras, footage, and equipment, without probable cause or legal justification to retain the property; this unlawful retention of the Plaintiff's property endured for a period of over one hour.

83.     The seizure of Plaintiff's cameras, footage, and equipment was done pursuant to WCSO's and APD's de facto customs, policies, and practices of seizing and retaining cameras, footage, and newsgathering equipment from journalists based on speculation that the journalists may have captured relevant footage, instead of going through the proper procedure of subpoenaing the footage.  The implementation of these de facto policies violated Big Fish's Fourth Amendment rights to be free from unreasonable searches and seizures.

84.     The conduct of the Defendants violated clearly established constitutional rights of which all WCSO and APD police officers knew, or of which reasonable police officers should have known, rendering them liable to Plaintiff under 42 U.S.C. § 1983.

85.     Defendants acted with reckless and callous indifference to the Plaintiff's Fourth Amendment rights.

86.     The denial of constitutional rights is irreparable injury per se, and the Plaintiff is entitled to declaratory and injunctive relief.

87.     As a direct and proximate result of all of the violations of the Plaintiff's Fourth Amendment rights, and the events that followed predicated on the same erroneous belief that

Defendants were entitled to full access to Plaintiff's unaired footage without pursuing legal process, the Plaintiff suffered damages, including:

      a) All the costs of addressing and responding to any investigations and other associated expenses, including attorneys' fees and costs; and

      b) Damage to its professional reputation.

**FOURTH CAUSE OF ACTION**
**Section 1983 Claim for Violation of Plaintiff's First and Fourteenth Amendment Rights**
**(42 U.S.C. § 1983)**
(AGAINST LIEUTENANT JAMES DAVID (in his individual capacity) and DOES 1 through 10)

88.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

89.    Observing and recording police activity in public is fully protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of Texas under the Fourteenth Amendment.

90.    By seizing the Plaintiff's cameras, footage, and equipment in response to their recording police activity in public, Defendants violated Plaintiff's clearly established First Amendment rights to gather, record, and disseminate news and information about events of public interest and of related police activity in public places.

91.    The seizure of and failure to immediately return the Plaintiff's cameras, footage, and equipment violated Plaintiff's clearly established First Amendment rights to gather, record, and disseminate news and information about events of public interest and of related police activity in public places.

92.    Defendants, each of whom were acting under color of state law, violated a clearly established constitutional right of which all WCSO and APD police officers knew, or of which

reasonable police officers should have known, rendering them liable to Plaintiff under 42 U.S.C. § 1983.

93.     Defendants acted with reckless and callous indifference to Plaintiff's First Amendment rights.

94.     The denial of constitutional rights is irreparable injury per se, and Plaintiff is entitled to declaratory and injunctive relief.

95.     As a direct and proximate result of all of the violations of the Plaintiff's First Amendment rights, the Plaintiff suffered damages, including:

    a) All the costs of addressing and responding to any investigations and other associated expenses, including attorneys' fees and costs; and

    b) Damage to its professional reputation.

### FIFTH CAUSE OF ACTION
**Section 1983 Claim for Violation of Plaintiff's Fourth and Fourteenth Amendment Rights**
**(42 U.S.C. § 1983)**
(AGAINST LIEUTENANT JAMES DAVID (in his individual capacity)and DOES 1 through 10)

96.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

97.     Under the Fourth Amendment to the United States Constitution, as applied to the State of Texas under the Fourteenth Amendment, Plaintiff has a right to be free from unreasonable searches and seizures.

98.     Defendants, each of whom were acting under color of state law, violated the Plaintiff's clearly established Fourth Amendment rights to be free from unreasonable seizures seizing the Plaintiff's cameras, footage, and equipment without probable cause to believe that Messrs. Mika or Moriarty were engaged in any criminal activity.

99.     Defendants violated the Plaintiff's clearly established Fourth Amendment rights to be free from unreasonable seizures by retaining Plaintiff's cameras, footage, and equipment, without probable cause or legal justification to retain the property; this unlawful retention of the Plaintiff's property endured for a period of over one hour.

100.     The conduct of the Defendants violated clearly established constitutional rights of which all WCSO and APD police officers knew, or of which reasonable police officers should have known, rendering them liable to Plaintiff under 42 U.S.C. § 1983.

101.     Defendants acted with reckless and callous indifference to the Plaintiff's Fourth Amendment rights.

102.     The denial of constitutional rights is irreparable injury per se, and the Plaintiff is entitled to declaratory and injunctive relief.

103.     As a direct and proximate result of all of the violations of the Plaintiff's Fourth Amendment rights, the Plaintiff suffered damages, including:

c)  All the costs of addressing and responding to any investigations and other associated expenses, including attorneys' fees and costs; and

d)  Damage to its professional reputation.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Big Fish respectfully requests judgment against the Defendants as follows:

A.     Declaring that the seizure and retention of Plaintiff's cameras, footage, and equipment in response to their recording police activity in public violated Plaintiff's clearly established constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution;

B. Declaring that the seizure and retention of Plaintiff's cameras, footage, and equipment violated Plaintiff's clearly established constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and the Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa *et seq.*;

C. An award of compensatory damages against Defendants jointly and severally, in an amount to be determined by a jury at trial, for damages Plaintiff suffered in the form of all reputational damages and the costs of addressing and responding to any investigation and other associated expenses, including attorneys' fees and costs, and damage to its professional reputation;

D. Pursuant to 42 U.S.C. § 2000aa-(6)(a) and (f), an award against Defendants jointly and severally of actual damages, in an amount to be determined by a jury at trial, but not less than $1,000, as suffered by Plaintiff as result of the unlawful seizure and retention of Plaintiff's cameras, footage, and equipment, plus attorneys' fees and costs, and damage to its professional reputation;

E. Punitive damages in an amount to be determined at trial;

F. Granting such other further and different relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable in this action.

Dated: March 26, 2021
         New York, New York

**DAVIS WRIGHT TREMAINE LLP**

By: ___*/s/ Elizabeth A. McNamara*___
Elizabeth A. McNamara (*pro hac vice* motion forthcoming)
Jeremy A. Chase (*pro hac vice* motion forthcoming)
Jesse Feitel (*pro hac vice* motion forthcoming)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone:  (212) 489-8230
Facsimile:  (212) 489-8340
Email: lizmcnamara@dwt.com
         jeremychase@dwt.com
         jessefeitel@dwt.com

**SUMPTER & GONZÁLEZ, L.L.P.**

By: ___*/s/ David González*___
David González
State Bar No. 24012711
3011 N. Lamar, Ste. 200
Austin, Texas 78705
Phone:  (512) 381-9955
Facsimile:   (512) 485-3121
Email: david@sg-llp.com

*Attorneys for Big Fish Entertainment LLC*